The Indianapolis and Vincennes Railroad Company v. McLin.

No. 9097.

THE INDIANAPOLIS AND VINCENNES RAILROAD COMPANY v. McLIN.

DEMURRER TO EVIDENCE.—*Practice.*—The practice in this State requires the party demurring to evidence to set it out and to admit all the facts which it tends in any degree to prove, and hence the court is not required, in considering the demurrer, to weigh or reconcile conflicting evidence, nor to consider that which favors the demurrant when in conflict with other evidence against him.

NEGLIGENCE.—*Railroad.*—*Highway Crossings.*—A railroad company is entitled to precedence at highway crossings, on condition that it shall give reasonable and timely warning of the approach of its trains, and a failure to give such warning is negligence.

SAME.—*Warning Signal at Railroad Crossing.*—The obligations of railroads and travellers on highways at crossings are mutual, the same degree of care being required of each, and the right of precedence belonging to the railroad does not relieve it of the duty to give proper warning of its approaching trains, nor to use reasonable care to avoid collision.

SAME.—*Excessive Damages.*—Where, without fault, the plaintiff's son, aged sixteen years, is seriously injured· by the negligent management of a railroad train, so as to be unconscious for a time and disabled for some weeks, a verdict for $530 damages will not be held excessive.

From the Knox Circuit Court.

*S. O. Pickens* and *H. Burns,* for appellant.

MORRIS, C.—This suit was brought by the appellee against the appellant to recover damages for an injury, alleged to have been inflicted upon her minor son, James McLin, by the appellant, through its carelessness and negligence, without any fault or negligence on the part of the appellee or her said son.

The complaint contained three paragraphs, to which the appellant answered by a general denial. The cause was submitted to a jury, and, after the appellee closed her evidence in chief and rested her case, the appellant demurred to the evidence. The jury was directed to return a verdict; assessing the appellee's damages conditionally, which was done, and the damages assessed at $530.

The court overruled the appellant's demurrer to the evi-

dence, to which the appellant excepted.    The appellant moved the court for a new trial of the issues in the cause, which motion was overruled.    It also moved the court for a new trial as to the assessment of damages, which motion was overruled.

The rulings of the court upon the demurrer to the evidence and upon the motions for a new trial are assigned as errors.

The error alleged to have been committed by the court, in overruling the motion for a new trial of the issues, is not pressed by the appellant, and will not be noticed.    The evidence is properly in the record.

It appears from the testimony, that, on the 17th day of September, 1878, the appellee's son, then about sixteen years of age, was seriously injured by a collision of a passenger train on the appellant's railroad, with a wagon drawn by two horses and driven by one William Sirp, who was a boy some sixteen years old.    The collision occurred at a highway crossing of the appellant's road, about a mile southwest of Edwardsport. The highway crosses the appellant's road at an angle of about forty-five degrees; the highway runs north and south and the railroad northeast and southwest.    At the crossing, the railroad is built upon an embankment seven to eight feet above the natural level of the ground; this embankment diminishes gradually from the crossing northeast 200 yards to a point where a cut begins; this cut extends northeast through a hill or elevation about 600 feet long, the greatest depth of the cut being eight or ten feet from the rail to the surface on top of the ground.    From a point one-half mile northeast of the crossing the railroad runs upon a straight line and a gradually descending grade to and southwest of the crossing.

The highway runs upon a straight line from a quarter of a mile or more north of the crossing to and south of the crossing.    About forty or fifty rods north of the crossing it ascends a hill of the same height as the hill through which the railroad cut is made; the fill in the highway to make the ascent upon the railroad from the north begins about thirty feet north of the center of the railroad; clumps of bushes, ranging

in height from fifteen to twenty feet, were growing in a field in the angle north of the railroad and east of the highway, beginning near the highway and running northeast parallel with the railroad about sixty feet, and from thirty to forty feet from it. On the day of the accident, shortly after 12 o'clock M., the train on appellant's railroad, consisting of a locomotive, one baggage and mail car and two passenger cars, was approaching the crossing from the northeast on time, at about thirty to thirty-five miles per hour. At the same time, appellee's said son and three other boys of similar age, in full possession of their senses of seeing and hearing, were, in a common two-horse wagon, approaching the crossing from the north, on the highway, at the ordinary walking speed of a team of horses attached to a wagon. Appellee's son was sitting down in the bed of the wagon and the other boys were sitting on a seat-board just in the rear of the first wheels. As the wagon got upon the crossing, the engine struck it in the front wheels, demolishing it, injuring the horses slightly, killing one of the boys, and injuring appellee's son and one of the other boys.

William Shiveley, a witness for the plaintiff, being duly sworn, testified as follows:

"Know the plaintiff and know the boy, but not very long. I live at Edwardsport; I know the place of the accident; the Vincennes and Wheatland road crosses the railroad at that point; it was a public highway, and used by the public generally; knew condition of crossing September 17th, 1878; not in very good condition; the dirt was washed away from the side of the rails; it was bad on both sides, but worse on north side. I owned land near the crossing; at the crossing, the fill of the railroad is seven or eight feet high and a hill to pull up; the dirt is worn away next to the rails; in crossing, it would check the horses; cross-ties projected outside of the rails and made a raise for horses and wagon to pull up, and, in pulling up, horses and wagon would be checked; there are some willow bushes in the corner of the field near the

crossing; some of these are fifteen or twenty feet high; they had leaves on them at time of the accident; some near the railroad, smaller ones, and some in my field; there were some dry brushes, also; the railroad, from the crossing in the direction of Edwardsport, is straight for over eighty rods; man on crossing can be seen from eighty rods towards Edwardsport; I heard noise of the collision, but did not see it; I did not hear bell ring or whistle before the collision; the noise of the collision was the first thing that attracted my attention; the wind was blowing pretty strong from the south; don't know what effect the blowing of the wind would have on the hearing of the train; I went to the crossing; did not see James McLin; the hind part of the wagon and bed were on the north side of the railroad, in field, and forepart of wagon was 200 yards down the railroad on the south side; the horses were going south on the road; the horses were not killed."

On cross-examination said witness testified as follows:

"The holes in the ground on the side of the railroad were made by wagons passing over the road; planks on outside of each side of the rails; my land is on the north side of the railroad and east of the wagon road, in the angle; the highest willows are inside of my field; my fence, at the crossing, is about forty feet from the center of the railroad, and, as it runs up side of the railroad, it is sometimes closer, and sometimes further off; the fill at the crossing is seven or eight feet high, and is higher than the fence, and runs on a fill higher than the fence nearly back to the cut; from the crossing to the cut is about twenty-five or thirty rods; the willow bushes are in bunches, some of them fifteen or twenty feet high; I saw the boys first just below Edwardsport, going towards the crossing; my son, Thomas Shiveley, and I were in a wagon, behind them; they were in a wagon; we came up close to them at the top of the hill, about fifty rods from the crossing; I got out of my wagon there and went over into my field on the east side of the wagon road; the boys were just before our wagon there;

William Sirp was driving their team, sitting on seat-board at front of wagon, and the other boys were down in the wagon bed playing over and under the seat-board; the boy that was driving was playing some, too; they were driving along slow, in a walk; I did not see the train before the accident; I was about forty rods from the crossing at the time of the accident and nearer the cut; I was northeast of the crossing; I was shucking corn in my cornfield; from the foot of the hill on the wagon road, north of the railroad, can see train coming out of the cut; at a point near the crossing, could not see the train; this is for twenty-five or thirty yards; at all other points from the hill to the crossing, the train can be seen; it is thirty rods from the foot of the hill, north of railroad, to the crossing; from that point the smoke of the train could be seen coming through the cut; the foot of the fill at the crossing, on the north side, is about thirty feet from the railroad; on this fill the train could be seen coming out of the cut; there were some brushes and briars on the fill four or five feet high; when on the fill, the train could be seen coming from the northeast eighty or 100 rods; the boys had an ordinary team; the boys lived south of railroad, in river bottom; they came over that road and crossing pretty often; person at foot of fill, on wagon road, on north side of railroad, could hear the train coming from the northeast if he were to stop; if wind was blowing it might affect it, but I think they could hear it; I think it could have been heard that day if they had stopped and listened at that point; I heard it, was forty rods away, and am partly deaf, can't hear well out of right ear; I think the train could have been heard coming from the northeast that day, at any point on the highway from the foot of the fill back to the hill north; I stood on higher ground than the dirt road where the boys were just before starting up the fill at crossing."

William Sirp, witness for the plaintiff, being duly sworn, testified as follows:

" I know the plaintiff and her son James; have known him

six or seven years; I knew him at the time he got hurt on the railroad; I was in the wagon that was struck by the cars; I was driving the horses; the crossing was in a bad condition; the fore wheels stopped when they struck the plank nailed on cross-ties just outside of the rail, and the hind wheels did the same, and each kind of checked the horses; I was driving, and was in the forepart of the wagon; I looked up and down the track and did not see the train; I drove on the track and was struck by the train and rendered insensible; I did not hear the train; I was listening; the wind was from the southwest at the time."

On cross-examination said witness testified as follows:

"I had been to Edwardsport to take a beef hide; John Sirp went with me; James McLin and John Bundle got in the wagon after we started and went along; this was in the morning, and I stayed there until noon; then we all started home in the wagon; I had steel-traps, sugar and coffee in wagon, and nothing else; I was sitting on seat-board, on the right side, driving in front part of wagon; the other boys were in back part of wagon; the boys were playing until we got within 300 or 400 yards of the railroad; we knew the train was about due and were expecting it; when in about thirty feet of the railroad I began looking for the train; could see up the road about 100 yards; we did not stop to look or listen; when we were within twenty feet of the railroad I could see up as far as the first cut; could not see any further because the road crooks towards Edwardsport; could see clear up to the crook towards Edwardsport when twenty feet from track on north side of railroad; think the railroad is only straight quarter of mile; we were about one minute going from twenty feet on north side of railroad to point where we were struck; from twenty feet north of railroad we were about two minutes getting up on railroad; fore wheels of wagon struck the railroad and kind of stopped; did not see or hear the train until wagon was struck; I was trying to get the horses across the rail-

road; I was not looking at the boys playing before going on the railroad; the wagon was making noise; the horses were going in a walk up grade to railroad; my father has a suit pending in this court for an injury to me and my brother received at the time."

James McLin, witness for the plaintiff, being duly sworn, testified as follows:

"I am the son of the plaintiff; on September 17th, 1878, I lived with my mother; I went to Edwardsport that day; got in wagon at railroad crossing and went with William Sirp; came back in the wagon and was hurt by the cars at the railroad crossing; saw William Shiveley in wagon behind us; William Sirp was driving wagon we were in; Thomas Shiveley was in wagon behind us; I was sitting in back part of wagon, on bottom; William and John Sirp and John Bundle were in the wagon; I knew the railroad was there; I had my left side to the left side of the wagon, and had my face fronting towards the horses; I could see part of way up the railroad; I looked up the railroad for the cars when starting up fill at the crossing, and did not then see the cars; I had been playing, but was not when wagon went upon the railroad; I knew nothing after cars struck me until the next day about 10 o'clock; I was confined to bed; my leg was hurt; it was sore a good while; I did not see or hear any train before wagon was struck; don't know how the wind was; I listened before we started up the grade on the track; my collar bone and head were hurt."

Upon cross-examination, said witness testified as follows:

"I am seventeen years old; was seventeen last August; all the boys were sitting on the seat-board at time of accident, except me; they had been sitting there all the time; I was sitting back and playing by myself, in back corner of the wagon; I testified on the other trial of this cause; I don't think I stated that I did not listen or look; I listened while down in the low place; the wagon was not stopped; wagon was rattling and making noise; I looked for cars at foot of

grade and upon the grade, and then I saw the train just as it struck the wagon; I had good sight and hearing."

Thomas Shiveley, witness for the plaintiff, being duly sworn, testified as follows:

"I know plaintiff and James McLin, her son; September 17th, 1878, I lived at Edwardsport with my father; on that day, I saw the Sirp boys and John Bundle and James McLin at Edwardsport near noon, on road, in wagon, between Edwardsport and the crossing; William Sirp was driving, and the other boys were playing in bottom of the wagon; I was behind them in a wagon with my father, William Shiveley; the boys were playing with some cans; at the foot of the hill, near the crossing, the boys stopped the wagon to fix the tire on the wagon wheel; when near the railroad, one of my horses began to prick up his ears and was uneasy; I looked up and saw smoke of train about one-half mile off; I saw the train was coming very fast, and hallooed at the boys, but I don't think they heard me, as they paid no attention to me and went ahead; at the time the boys struck the railroad, the train was in the cut; the train had not reached the first cut northeast of crossing when I hallooed to the boys; there was a raise of near a foot of the wheels of the wagon to get upon the railroad track; the wagon seemed to hang and then raised on to the track, and the hind wheels of the wagon hung when they struck the rail, and then the engine struck the fore wheels of the wagon; the engineer reversed the engine about sixty feet before it struck the wagon; I got out and went to the boys and found them hurt; James McLin was lying on the ground with his head under him, and his head, neck and leg were injured; bleeding at ears and mouth; I opened his collar; the train ran 302 steps, or about 300 yards, west of the crossing, before it stopped; the forepart of the wagon was thrown off there; the train then backed up to the crossing and the boys were put on; the horses were not killed, but hurt some, and they ran off on the road south; did not hear any signal given by the engineer, except when the engine was reversed the bell

tapped twice; the train was going faster than usual; they. usually go pretty fast there; it was down grade; black smoke was coming out of the smokestack; on the north side of the railroad and on the east side of the highway were some willow bushes—some in father's field and some between the fence and the railroad; think when wagon was upon railroad, the Sirp boy raised up in wagon, as though to make the horses go faster; the train was passenger train—two coaches and baggage car; I have travelled a good deal on railroads and seen trains stopped in about 100 yards; it was about 300 yards from the crossing to the beginning of first cut; the cars were about at the mouth of first cut when the boys got on the track; it is tolerably heavy down grade there; there are other grades heavier on the road; I have often seen trains pass at the point where the accident occurred; I have often seen trains stopped on road by application of air brake; this train was provided with air brakes; the train could have been stopped between the cut and the crossing; there were bushes and briars and weeds, from the fence to the railroad track, and inside of the fence the bushes were higher; a person at foot of grade going up on the railroad is about thirty feet from the railroad track; the road up to the railroad is just wide enough for a wagon, and, after going up to the railroad, the wagon could not turn around and go back, but could be backed off; the dirt road had been narrowed at the crossing by the removal of earth, leaving single wagon track; when engine struck the wagon, William Sirp was thrown up as high as the top of the smokestack; the other boys were thrown, with the wagon bed, on the west side of the road into the field; person on the railroad, at the crossing, could see east on the railroad, one-half mile, and the engineer might see a man on the crossing for the same distance; the wagon hung on the track about half a minute before the collision; I was once riding on defendant's railroad when train was running very fast, and cow got on track, and train was stopped in 100 yards; this was on heavier grade

than at the road crossing where McLin was hurt, and was near Eel river."

On cross-examination, the witness testified that the appellee's son had attended a school taught by him; that he learned well and had his hearing.

There were other witnesses who testified, but their testimony was substantially in agreement with the foregoing. All the witnesses testified that the appellant did not ring a bell or give other warning as the train approached the crossing where the appellee's son was injured. It was admitted by the appellant that it owned, and was running upon its road, the train of cars which struck and injured the appellee's son.

The appellant insists that from the testimony it appears,

First. That the injury complained of was not caused by its negligence.

Second. That the negligence of appellee's son proximately contributed to his injury.

Third. That the damages are excessive.

The appellant contends that its demurrer to the evidence admits the truth of the facts proved—" demonstrated "—not the truth of the facts testified to by the appellee's witnesses. We understand the rule to be, that the demurrer admits all the facts to be true which the evidence offered by the other party *tended* in *any degree* to prove ; that regularly, if the evidence is loose, circumstantial or uncertain, the duty of weighing and reconciling it can not be withdrawn from the jury and devolved upon the court by a demurrer to the evidence ; but that, in such case, the demurrant should specify the facts proposed to be admitted, and then the other party, if called upon to join in the demurrer, may refer the question as to whether he is bound to join, to the court for decision. But in this State the party is allowed to demur by setting out the evidence and admitting all the facts which it tends to prove. This does not devolve upon the court the decision of the facts. It would obviously do so if the admission did not embrace all the facts which the evidence tends to prove. This

mode of proceeding is more convenient and better adapted to our system of practice than would be the stricter and more technical method of the common law.

In the case of *Wright* v. *Pindar*, Style, 34, quoted in the case of *Copeland* v. *New England Ins. Co.*, 22 Pick. 135, Chief Justice ROLLE says: " Matter of fact ought to be agreed in a demurrer to evidence, otherwise the court can not proceed upon the demurrer; for the judges can not try the matter of fact, for that were for the judges to give the verdict, which belongs to the jury."

In the case of *Young* v. *Black*, 7 Cranch, 565, Judge STORY says: "The party demurring is bound to admit as true, not only all the facts proved by the evidence introduced by the other party, but also all the facts which that evidence legally may conduce to prove."

In the case of *Fowle* v. *Common Council of Alexandria*, 11 Wheat. 320, the court says: " It is no part of the object of such proceedings," (a demurrer to the evidence,) "to bring before the court an investigation of the facts in dispute, or to weigh the force of testimony or the presumptions arising from the evidence. That is the proper province of the jury. * It supposes, therefore, the facts to be already admitted and ascertained, and that nothing remains but for the court to apply the law to those facts." Gould states the law to be the same. Gould Pleadings, section 47.

In the case of *Copeland* v. *New England Ins. Co., supra,* the court say: " The defendants too, by demurring, admit the facts which the evidence conduces to prove for the plaintiffs, and can not avail themselves of such as it tends to show for the defendants. The plaintiffs, by joining in the demurrer, did not admit the truth of that part of the testimony which is favorable to the defendants, much less any inferences which may be drawn from it." And this, we think, must be the correct rule; else the court, in passing upon the demurrer, must weigh the evidence, and reconcile it if conflicting or in-

consistent. In other words, the demurrer brings before the court the facts for investigation. This it can not do.

In the case of *Ohio, etc., R. W. Co.* v. *Collarn,* 73 Ind. 261 (38 Am. R. 134), the court says: "'By a demurrer to the evidence, all the facts of which there is any evidence are admitted.'" *Miller* v. *Porter,* 71 Ind. 521; *Eagan* v. *Downing,* 55 Ind. 65; *Newhouse* v. *Clark,* 60 Ind. 172. These cases are in substantial agreement with the authorities cited above. "A demurrer to the plaintiff's evidence admits all the facts that the evidence tends to prove." Wharton Ev., section 840. To the same effect is the case of *Golden* v. *Knowles,* 120 Mass. 336; *Lemmon* v. *Whitman,* 75 Ind. 318 (39 Am. R. 150).

There was evidence introduced by the appellee, tending to prove that the appellant was running the train at the time it struck the appellee's son, at the rate of thirty-five miles per hour, or something over a half mile a minute; that no bell was rung as the train approached the crossing, or other signal or warning of its approach given; that the engineer on the train could have seen the wagon in which the appellee's son was riding, from the time the engine emerged from a cut some two hundred yards distant from the crossing; that there were air brakes on the train, and that with them the train could have been stopped in one hundred yards. As we understand the meaning and effect of the demurrer, as there was testimony tending to prove the facts above stated, we must assume them as true. Taken as true, there is hardly room for doubt upon the question of the appellant's negligence.

Shearman and Redfield, in speaking of the duty of railroad companies to give warnings at the crossings of highways, of the approach of trains, say: "It is the duty of the engineer * to give sufficient signals of the approach of the train, by ringing his bell, sounding the whistle, or otherwise, as may be usual." Neg., 3d ed., sec. 481.

In the case of *Continental, etc., Co.* v. *Stead,* 95 U. S. 161, the court says: "The train has the preference and the right of way. But it is bound to give due warning of its approach, so

that the wagon may stop and allow it to pass, and to use every exertion to stop if the wagon is inevitably in the way. Such warning must be reasonable and timely. But what is reasonable and timely warning may depend on many circumstances. It can not be such, if the speed of the train be so great as to render it unavailing. * * The speed of a train at a crossing should not be so great as to render unavailing the warning of its whistle and bell; and this caution is especially applicable when their sound is obstructed by winds and other noises, and when intervening objects prevent those who are approaching the railroad from seeing a coming train."

The day was windy and there were bushes tending in some degree to obstruct the view of trains approaching the crossing in question. We think it must be held that the negligence of the appellant caused the injury complained of to the appellee's son. There should have been some warning given of the approach of the train to the crossing.

Was the appellee's son guilty of contributory negligence? If it were the duty of the court upon this demurrer to weigh the evidence, and, in view of all the circumstances, determine its force, the question would, to say the least, be left in great doubt.

The injured boy swears that he knew where the railroad was; that he could see part way up the track; that he looked up the railroad for the cars; that he had been playing, but was not when the wagon went upon the railroad; that he did not see nor hear any train before the wagon was struck; that he listened for the train before starting up the grade to the track; that he listened while down in the low place; that the wagon was rattling and making a noise; that he looked for the cars at the foot of the grade and when on the grade.

Taking these statements in connection with the fact that the train was running at such a rate of speed that it would pass from the cut to the crossing, about 200 yards, in less than fifteen seconds, and with the further fact that no warning of the approaching train was given, it can not be said,

The Indianapolis and Vincennes Railroad Company *v.* McLin.

we think, that the boy was guilty of contributory negligence. Indeed, he had done all that care and prudence could require. He had stopped and looked and listened. He had a right to expect that if the train was approaching, some timely and reasonable warning would be given. None was given. He had, therefore, a right to assume that the passage over the railroad might be made without danger from the appellant's trains.

William Sirp, who controlled and drove the wagon in which the appellee's son was riding, testified that he looked and listened for the train, but did not hear or see it.

The testimony of these boys, was not, seemingly, consistent with that of Thomas Shiveley and some other witnesses. Shiveley states that he was in a wagon just behind that in which McLin was riding; that he saw from the hill the smoke from the engine when it was about a half mile from the crossing; that he called to the boys, but they did not hear him. This may all be true, and yet it does not follow necessarily that the boys in the forward wagon could have seen the smoke. Their position and intervening objects might have prevented them from seeing the smoke. But, however this may be, we can not, upon the demurrer, undertake to weigh or reconcile the evidence. As there is testimony tending to show that there was no negligence on the part of James McLin contributing to his injury, we must regard him as free from fault.

The obligations of railroads and travellers at intersecting highways are mutual. The same degree of care is required of each. " For," as said in the case of *Continental, etc., Co.* v. *Stead, supra,* " conceding that the railway train has the right of precedence of crossing, the parties are still on equal terms as to the exercise of care and diligence in regard to their relative duties. The right of precedence referred to does not impose upon the wagon the whole duty of avoiding a collision. It is accompanied with, and conditioned upon, the duty of the train to give due and timely warning of approach. The duty of the wagon to yield precedence is based upon this condition."

The Indianapolis and Vincennes Railroad Company *v.* McLin.

We can not say that the damages were excessive. The appellee's son was seriously injured. He was unconscious for some time, and disabled for some weeks. The jury gave $530 damages. Unless at first blush they seem to be excessive, this court should not disturb the verdict. We think there is no error in the record.

PER CURIAM.—It is ordered, upon the foregoing opinion, that the judgment below be affirmed, at the appellant's costs.

ON PETITION FOR A REHEARING.

MORRIS, C.—An able and earnest petition for a rehearing has been filed in this case.

The appellant's counsel, conceding that the testimony tends to show that the injury complained of was produced by its negligence, insists that, unless the evidence also shows, or tends to show, that the appellee's son was free from contributory negligence, the demurrer to the evidence should have been sustained; and in determining this question he insists that all the testimony, as well that which was elicited on cross-examination by the appellant, as the testimony in chief put in by the appellee, must be considered. We understand the counsel to go further, and to contend that if there is any conflict in the testimony, as set out in the record, the court, in deciding upon a demurrer, shall weigh it, and deduce from it such conclusions as a jury might reasonably have reached. If there is testimony tending to show that the injured party was free from fault, and other portions of the testimony tend to show, by an apparent preponderance, that he was guilty of contributory negligence, the demurrer should be sustained.

We agree with the appellant that the burden was upon the appellee to show that her son was not in fault; that his negligence did not contribute to his injury, and that, unless the testimony tended to show that he was free from fault, the demurrer to the evidence should have been sustained. And we also further agree with the appellant, that, for the purpose of

determining whether there was any testimony tending to show the injured party free from fault, the court should consider all the evidence in the case. But we still think, as was held in the opinion already announced in the case, that if there was any testimony in the case, legally tending to show that the appellee's son was not guilty-of contributory negligence, then the demurrer was rightly overruled, though other portions of the testimony tended to show, with preponderating force, that he was in .fault. The court will not weigh, nor undertake to reconcile, such conflicting testimony. If there is conflicting testimony to be reconciled and weighed, it is the right of the parties to have this done by a jury, and neither party can deprive the other of this right by demurring to the evidence. Had one witness testified to facts legally tending to show the injured party free from fault, and had two or a half a dozen other witnesses testified to conflicting or other facts, tending legally to prove him guilty of contributory negligence, a jury, had the question been submitted to them, might have believed the one and disbelieved the half a dozen witnesses, and found the appellee's son free from fault. And, had such been the case, this court would not disturb the verdict upon appeal. So, upon demurrer to the evidence, the court will consider all the evidence, for the purpose of determining, as a matter of law, whether there is any evidence tending to show that the appellee's son was free from fault; if there is such testimony in the record, the court will draw the conclusion against the demurrant. This the court must do, or usurp the duties and functions of the jury. If the court undertakes to weigh or reconcile the testimony or determine the credibility of witnesses, it must, obviously, assume the functions of the jury. This it should not do.

The only question in the case is, was there any testimony legally tending to show that the appellee's son was free from fault? The appellant contends that there was not.

It appears from the testimony that the train of the appellant, which struck the wagon in which the appellee's son was

riding, passed through a cut north of the crossing, about 600 feet long, and, at places, some ten feet deep. From the cut to the crossing, about 300 yards, the road was built upon an embankment at places eight feet high. There were bushes and briars growing upon the right of way and in adjoining fields, tending, in some measure, to obstruct the view and interrupt the sound of trains moving upon the appellant's road. The train approached the crossing at a speed of thirty-five miles per hour; no bell was rung nor whistle sounded. The highway, upon which the appellee's son was travelling, runs north and south, and passes over a hill some forty or fifty rods from the crossing. A short distance from the crossing, about fifty yards, there is a depression in the highway, from which a train moving through the cut on appellant's road could not be seen. The highway begins to ascend to the crossing about thirty feet from the center of the railroad track. The appellee's son was riding in a two-horse wagon, with three other boys about his own age. The team was driven by one William Sirp, who had the rightful control and management of it and the wagon. The crossing was in bad condition, and, when driven upon by Sirp, the fore wheels of the wagon were stopped by the plank nailed on the ties. The foregoing facts are not disputed. It may be fairly inferred, from his age, that William Sirp, who had charge of the team and wagon, was competent and fit to take and have charge of them.

William Sirp swears that he was driving the horses; that the crossing was in bad condition; that the fore wheels of his wagon stopped when they struck the plank nailed on the ties; that he looked up and down the track, but did not see the train; that he drove on the track, was struck by the train and rendered insensible; that he did not hear the train.

James McLin, the appellee's son, who was injured, testified that he got into the wagon with William Sirp, who was driving it; that he could see part of the way up the railroad; knew it was there; looked up the railroad for the cars when they started up the fill at the crossing, and did not see the

cars; had been playing, but was not when the wagon went upon the railroad; did not see or hear anything before the wagon was struck, though he listened before they started up the grade on the track.

In determining the force of the above testimony, it must be borne in mind that James McLin had a right to act in some degree, upon the assumption that the appellant would give timely warning of the approach of its trains by the usual signals, and that he had also a right, in some measure at least, to rely upon the prudence and care of the young man in charge of the team. If, as he swears, he looked and listened for the train when they began to ascend the grade, not more than thirty feet from the center of the railroad, and did not see nor hear the approaching train, was he not free from fault? What else was it his duty to do? He looked and listened, but could neither see nor hear an approaching train. No bell was ringing, no whistle sounding. Everything indicated the absence of danger. He had a right to know, for such is the law, that it was quite as much the duty of the appellant to give timely warning of the approach of its cars to the crossing, as it was his duty to listen for such warning. He listened, but there was no warning; he looked but no train or danger could be seen. This was all the law, under the circumstances, required. While it is true that the failure of the appellant to give warning did not relieve the appellee's son from exercising care to avoid injury, yet the absence of such warning is a circumstance to be taken into consideration in determining whether he did exercise the degree of care required or not. *Continental, etc., Co.* v. *Stead*, 95 U. S. 161.

The appellant, however, insists that to look and listen was not enough; that the appellee's son should have stopped the wagon. We think that to so hold, under the circumstances of this case, would be to devolve upon the traveller too exclusively the risks and duties at railroad crossings, and to relieve the appellant too entirely from responsibilities which the law justly imposes upon it. Admitting itself to have

been·in fault, the appellant seeks to escape from the consequences of its own wrong, because the appellee's son is blamable for not stopping the wagon in which he was riding, though he neither had the management nor control of it.

In the case of *Masterson* v. *New York, etc., R. R. Co.,* 84 N. Y. 247 (38 Am. R. 510), the plaintiff was, by the invitation of the driver, a stranger to him, riding in a wagon upon a highway crossed by defendant's road. A wheel of the wagon went into a hole between the rails of defendant's track, and he was jolted from the wagon and killed. It appeared that the driver was a sober man, and apparently fit to have charge of the team. The defendant asked the court to charge the jury, that if the driver's negligence was the proximate cause of the jar, the plaintiff could not recover. The court refused this charge; the court of appeals held the refusal right, on the ground that the deceased had no control of the wagon, and was not guilty of negligence in riding in it with the driver.

In the case of *Dyer* v. *Erie R. W. Co.,* 71 N. Y. 228, which is really this case, it was held that where one travels in a vehicle over which he has no control, but at the invitation of the owner and driver, no relationship of principal and agent arises between them, and that although he so travel voluntarily and gratuitously, he is not responsible for the driver's negligence, where he himself is not chargeable with negligence, and where the driver was competent to control and manage the team. The same doctrine was held in the case of *Robinson* v. *New York, etc., R. R. Co.,* 66 N. Y. 11 (23 Am. R. 1).

In the above case the authorities are extensively reviewed and carefully considered. In holding that the appellee's son was not, under the circumstances of this case, guilty of negligence because he did not stop before going upon the appellant's road, we need not, nor do we, go so far as the above cases go; we only hold that the facts tend to show that the injured party was free from fault.

It is true, as the appellant contends, that the testimony of Thomas Shiveley tends strongly to show that if the appellee's

son had listened he might have heard the approaching train; but the son's testimony tends just as strongly to prove that Shiveley could not hear the train, as does the latter's tend to prove that the former could have heard it. We will not attempt to determine which was right. The team, which was hauling appellee's son, was going slowly. It would take it some seven or eight minutes to pass from the hill to the crossing, some forty or fifty rods. When the wagon was on the hill, the train must have been at Edwardsport, and when the team was in the low part of the highway, some thirty feet from the railroad track, the train was probably in the cut, and not visible to the appellee's son. It would pass, going at thirty-five miles per hour, from the middle of the cut to the crossing, while the team would pass up the grade on to the track. It is, therefore, not at all improbable, that the appellee's son looked and listened, and neither heard nor saw the coming train.

The petition should be overruled.

PER CURIAM.—Petition overruled.