The Lake Shore and Michigan Southern Railway Company *v.* Foster.

## No. 11,529.

## THE LAKE SHORE AND MICHIGAN SOUTHERN RAILWAY COMPANY *v.* FOSTER.

DEMURRER TO EVIDENCE.—A demurrer to the evidence admits all facts which the evidence adduced by the adverse party tends to prove, or of which there is any evidence however slight, and all inferences which can be logically and reasonably drawn from the evidence.

SAME.—Evidence adduced by the party demurring will not be considered, as by demurring he withdraws from the consideration of the court all evidence offered by him.

SAME.—In passing upon the evidence demurred to, the court will not attempt to reconcile conflicts, and hence will not consider such evidence as is favorable to the demurring party, if there be any opposing evidence upon the same question of fact; neither will it weigh evidence to determine whether any particular fact is established, but will take as true every fact of which there is any evidence.

SAME.—If the plaintiff call several witnesses to prove the same transaction, some of whom testify unfavorably to him, and others in his favor, the defendant by demurring to the evidence admits that the latter have told the truth, and so the court must take it though the jury might have believed the former.

SAME.—On a demurrer to the evidence, forced and violent inferences are not admitted, but only such as a jury might draw, or which may be reasonably drawn, from the admitted facts.

COMMON CARRIER.—*Liability for Baggage.—Rules of Company.*—A rule by a railway company, that a person, intending to become a passenger, shall purchase a ticket or pay fare before the company receives and becomes responsible for his baggage, is a reasonable regulation, but if no such rule is adopted, or, being adopted, is not observed by its agents, or, if notwithstanding such rule, a trunk is received as baggage, trusting to the honesty of the owner to purchase a ticket or passage upon the train upon which the trunk is to go, such company will be liable for its loss to an owner who has acted in good faith, whether such loss occurred before or after the arrival and departure of the train, or before or after the purchase of a ticket or the payment of fare.

SAME.—*Agent.—Notice to Third Person.*—Where a baggageman is the agent of a railway company, with general authority to receive the baggage of persons intending to go upon the company's train, and does receive baggage in violation of the rules and regulations of the company, the latter will be liable for the loss of such baggage to the owner who has delivered the same in good faith within a reasonable time before the departure of the train, unless the existence of such rules is brought to the knowledge of such owner.

The·Lake Shore and Michigan Southern Railway Company v. Foster.

SAME.—*Restrictions upon Agent's Authority.*—Restrictions upon an agent's apparent authority are not binding upon third persons, where there is nothing to put them on inquiry as to the extent of his actual authority.

From the Elkhart Circuit Court.

*A. Pond* and *O. G. Getzendanner*, for appellant.

*H. C. Dodge*, for appellee.

ZOLLARS, J.—Appellee brought this action to recover the value of a trunk and its contents. Her counsel concede that the evidence in the case is correctly set out in appellant's brief. As there set out it is as follows, except some immaterial omissions :·

Mary Foster, the plaintiff, testified :

" On the 17th day of November, 1882, I was going to Chicago on a visit, and on the evening before tried to find a man to take my trunk to the depot. I met Mel Quimby, and he said he would send a man. Will Spicer came to take my trunk. I told him to take it to the depot and tell the baggageman that I was going off on No. 5 the next morning. He is expressman for Mr. McGowan. I delivered the trunk to Will Spicer, the expressman, about half-past 9 o'clock on the evening of the 16th of November, 1882. I was to go off at 4 : 25 the next morning. The next morning when I got my ticket I went to the baggageman in the baggage-room and asked for my trunk. He said ' which one of these trunks is yours?' I said ' none of them.' I asked Mr. Quimby the evening before to get the trunk checked. Mr. Wilcox said he did not know where my trunk was, that he had not seen it since immediately after the departure of No. 6 the night before, and that there had been baggage stolen there before from the platform. He said, we do not take in baggage unless it is checked. I had sent my trunk down once before when I went east, and found it was all right. I had my wearing apparel in the trunk—an overskirt and dress worth $40 ; a green dress worth $5 ; a dress skirt worth $1 ; a hat $7.50 ; oil paintings $9 ; gold cross $5 ; jewelry $12 ; shawl $3.50 ;

table spread and napkins $3.15; handkerchiefs and ties $2; a small gold watch $15; and other articles I did not remember when I gave Mr. Dodge the list, but have missed since. When I did not find my trunk I went back home, and did not go to see anybody, until about 7 o'clock I called at Colonel Tucker's office to see about it. Mr. Tucker said he would see that it was all made right, and would hunt it up for me. After buying the ticket I called for my trunk, but did not get it. I got it the next afternoon, with two articles in it, and they were spoiled. Marshal Miller brought it to me. I have never been paid for those goods. The total value is $125."

William Spicer, being called on behalf of the plaintiff, testified as follows:

" I live at Elkhart. Mr. Quimby saw me at the depot and asked if I would go and get a trunk up at Hayden's barber shop, and I went. Miss Foster gave me the trunk and told me to take it to the depot, and I did. I put it where Quimby told me. He said 'put it down there under the eaves, in the dry.' It was raining. I did so and went off. I put it down under the eaves of the depot building, near the baggage-room door. The baggageman was not there. I have not hauled baggage long—only about a month. I deliver baggage to and from every train from the hotels. Sometimes we put it on the platform and under the eaves. I was not acquainted with Mr. Wilcox. I knew the baggageman when I saw him. He would take baggage when the owners came to get it checked. He would not take it until owners came to get it checked."

Mel Quimby, being called in behalf of the plaintiff, testified as follows:

" On the evening of November 16th, 1882, it was raining. I was going to Chicago on No. 5 the next morning. I met Miss. Foster and walked up street with her. I said to her, ' I am going to Chicago in the morning,' and said I must go and get my trunk checked. She said she was going, too, and asked me to get hers checked, too. I employed Spicer to get her

trunk and bring it to the depot. He went after the trunk with a truck. I was there when he came with it. I said to Spicer, 'Dump it right down here near the baggage-room door, under the eaves, in the dry.' I went to reach for the door and Mr. Wilcox stepped out. He is the baggageman. I had started to open the baggage-room door. I said to Wilcox, 'Here is a trunk for No. 5, put it in the baggage-room.' He said 'No, leave it out there, it will be all right.' This was about half-past 9 o'clock. It was Miss Foster's trunk."

Henry Wilcox, being called on behalf of the plaintiff, testified as follows:

"I live in Elkhart. On November 16th I was employed in checking baggage. I was the night baggageman. I receive baggage for the company when a ticket is presented, and then give a check for it, but not without. Quimby called my attention to the matter of the trunk the next morning, but not that night. He asked me the next morning whether I saw the trunk. I did not see Quimby at all the night before, and he did not call my attention to any trunk the night before. I did not tell him to leave it there. I did not know he left a trunk on the platform."

On cross-examination:

"My duty was to receive baggage of passengers when they had tickets. I received baggage when persons had tickets, but not otherwise. I received trunks at the baggage-room door, if persons were going away at once on the train; otherwise in the room only—when they got tickets and their trunks checked, and not otherwise. When baggage is put in the room unchecked, it is at their own responsibility, and persons are told so. Quimby never called my attention to any trunk that night. I did not see him that night. Saw him in the morning when he was going off on No. 5. He came to get his trunk checked. He and Miss Foster asked about her trunk. I told them I didn't know anything about her trunk. Mr. Quimby did not claim that he called my attention to the trunk the night before, and never said anything about the

trunk being there the night before. I never saw the trunk. It never was delivered to me, nor my attention called to it."

On re-direct examination:

" I said to Quimby and Miss Foster the next morning that I saw a trunk the night before, after No. 6 left, sitting about eight feet from the baggage-room door, under the eaves, but that I did not know whose it was. I locked up the baggage-room when I left. I saw a trunk sitting there, but I did not know whose it was."

Re-cross examination.

" Trunks are often left sitting there on the platform soon after trains arrive or just before they depart, but I pay no attention to them until they are pointed out to me by some one who wants them checked. The principal baggageman is Mr. Barbour. His assistant is Mr. Hockman. I am night baggageman. No one called my attention to the trunk the night before when it was left there."

Re-direct:

" I was discharged by the company soon after the loss of the trunk. I did not understand why. Heard it was something about the police duty. I was re-employed again."

C. W. Green testified on behalf of the plaintiff as follows:

" I am the station agent of the Lake Shore and Michigan Southern Railway Company at Elkhart, and have charge of the company's business there. Mr. Wilcox was the night baggageman for the Lake Shore and Michigan Southern Railway Company at Elkhart, Indiana, on November 16th, 1882. The baggage-room in which Mr. Wilcox worked was the baggage-room of the Lake Shore and Michigan Southern Railway Company. He had authority to receive and check the baggage of passengers. The Lake Shore and Michigan Railway Company is an incorporated company, I suppose, and is engaged in carrying passengers in and through the county of Elkhart and State of Indiana."

On cross-examination:

" The baggageman has no authority to receive baggage ex-

cept on presentation of a ticket, showing the destination of the owner, then the baggage is checked and received by the company. The company takes no charge of it until it is presented to the agent and checked. It would be impossible to do it otherwise. The company could not look after trunks that persons leave on the platform, and it never does so until they are placed in charge of the baggageman and checked. It occurs frequently that trunks are left on the platform by parties, but the baggagemen pay no attention to them until they are presented to them to be checked."

Appellant demurred to the evidence. The court overruled the demurrer, and rendered judgment for appellee. Appellant prosecutes this appeal and insists upon a reversal of the judgment upon the grounds:

*First.* There is no evidence that the trunk was ever delivered to or received by the appellant or its agent.

*Second.* There is no evidence that the appellant's agent had any authority to receive the trunk in the absence of the appellee, and in advance of the time when she proposed to become a passenger on its train.

*Third.* The evidence introduced by the appellee shows affirmatively that the appellant's agent had no authority to receive the trunk in the manner it was received by him.

It should be remembered at the outset, that the case must be disposed of upon the demurrer to the evidence. So far as the questions have been presented, this court has, upon ample authority, laid down the following rules to be applied in passing upon such a demurrer:

*First.* A demurrer to the evidence admits all facts which the evidence tends to prove, or of which there is any evidence, however slight, and all inferences which can be logically and reasonably drawn from the evidence. *Lindley* v. *Kelley,* 42 Ind. 294; *Newhouse* v. *Clark,* 60 Ind. 172; *Griggs* v. *Seeley,* 8 Ind. 264; *City of Indianapolis* v. *Lawyer,* 38 Ind. 348; *Eagan* v. *Downing,* 55 Ind. 65; *Pinnell* v. *Stringer,* 59 Ind. 555; *Thomas* v. *Ruddell,* 66 Ind. 326; *Atherton* v. *Su-*

*gar Creek, etc., T. P. Co.,* 67 Ind. 334; *Miller* v. *Porter,* 71 Ind. 521; *Ohio, etc., R. W. Co.* v. *Collarn,* 73 Ind. 261 (38 Am. R. 134); *Nordyke, etc., Co.* v. *Van-Sant,* 99 Ind. 188; *Kincaid* v. *Nicely,* 90 Ind. 403; *Hagenbuck* v. *McClaskey,* 81 Ind. 577.

*Second.* The above rule has reference to the evidence of the party adverse to the party who files the demurrer. The evidence adduced by the party demurring will not be considered. By demurring, he withdraws from the consideration of the court all evidence offered by him, admits as true whatever facts the evidence adduced by the adversary tends to prove, and all reasonable inferences to be drawn therefrom, and asks for a decision of the law upon such admitted facts. *Fritz* v. *Clark,* 80 Ind. 591; *Indianapolis, etc., R. R. Co.* v. *McLin,* 82 Ind. 435; *Plant* v. *Edwards,* 85 Ind. 588; *Ruddell* v. *Tyner,* 87 Ind. 529; *Adams* v. *Slate,* 87 Ind. 573; *Ruff* v. *Ruff,* 85 Ind. 431; *Reynolds* v. *Baldwin,* 93 Ind. 57; *Radcliff* v. *Radford,* 96 Ind. 482; *McLean* v. *Equitable Life Assurance Society of U. S.,* 100 Ind. 127 (50 Am. R. 779); *Wright* v. *Julian,* 97 Ind. 109; *Stockwell* v. *State, ex rel.,* 101 Ind. 1.

*Third.* In passing upon the evidence demurred to (which, as we have seen, is the evidence of the party adverse to the party demurring), the court will not attempt to reconcile conflicts, and hence will not consider such evidence as is favorable to the demurring party, if there be any opposing evidence upon the same question; and hence, also, will not weigh the evidence to determine whether any particular fact is established, but will take as true every fact of which there is any evidence. *Willcuts* v. *Northwestern Mut. Life Ins. Co.,* 81 Ind. 300; *Indianapolis, etc., R. R. Co.* v. *McLin, supra; Ruff* v. *Ruff, supra,* and cases there cited; *Bethell* v. *Bethell,* 92 Ind. 318; *Wright* v. *Julian, supra; McLean* v. *Equitable Life Assurance Society of U. S., supra; Stockwell* v. *State, ex rel., supra.* In the case of *Willcuts* v. *Northwestern Mut. Life Ins. Co., supra,* which is a well considered case upon the question of a demurrer to evidence, this court quoted with ap-

proval from 2 Tidd's Practice, 865, note, the following: " So, if the plaintiff call several witnesses to prove the same transaction, some of whom testify unfavorably to him and others in his favor, the defendant, by demurring to the evidence, admits that the latter have told the truth, and so the court must take it, though the jury would have believed the former."

*Fourth.* There is a limitation upon the general rules above stated, which, in some sense, is itself a rule, and that is, that while a demurrer to evidence admits as true all facts of which there is any evidence, and all inferences which a jury might draw from them, or which may be reasonably drawn from them, forced and violent inferences are not admitted. *Willcuts* v. *Northwestern Mut. Life Ins. Co.*, supra; *Talkington* v. *Parish*, 89 Ind. 202; 2 Tidd Pr. 865, note.

Appellant's first contention is, that there is no evidence that the trunk was ever delivered to or received by appellant or its agent, and that, hence, its demurrer to the evidence should have been sustained. We think that under the above rules and decisions the court below correctly held that the evidence tended to show a delivery of the trunk by appellee and an acceptance of it by appellant. Appellee testified that she sent her trunk in the evening, between 9 and 10 o'clock, with a view of taking the 4:25 morning train, known as No. 5, and that she had so sent her trunk in advance of the train on a former occasion.

Her witness, Quimby, who acted as her agent in the delivery of the trunk, testified that after the trunk arrived and had been placed upon the platform near the baggage-room door, and " under the eaves, in the dry," and as he was about to open the door of the baggage-room, Mr. Wilcox, the baggageman, came out, when he, Quimby, said: " Here is a trunk for No. 5; put it in the baggage-room." The baggageman answered: " No, leave it out there, it will be all right."

This evidence, we think, tends to prove that the baggageman accepted and received the trunk as baggage, and that the owner, by her agent, surrendered the possession, care and

control of it to him. If the case had gone to the jury upon the above evidence alone, and they had found that the trunk was delivered as baggage, clearly this court, upon appeal, could not reverse the judgment for want of evidence.

From the above evidence, in connection with the balance of appellee's testimony, it is plain that the trunk was sent to the baggage-house as baggage, and not as freight or merchandise of any kind. Appellee intended to take the morning train; she had thus sent her trunk in advance of the train upon a former occasion, and it seems to have been received. She doubtless thought that it would be so received upon this occasion. The reasonable inference is that Quimby, her agent, when he asked the baggageman to put the trunk into the baggage-room, thought that the agent would accept it, and take care of it in advance of the train upon which it was to be transported. And when the baggageman told him to "leave it out there, it will be all right," he might well infer that the agent intended to, and would, look after it as in his possession. The simple "no," to the request to put it in the room, in connection with what followed, would not lead Quimby to understand that the agent declined to receive the trunk. Quimby's action in going off and leaving the trunk indicates that he understood from the agent's answer that he would receive and take care of the trunk until the arrival of the morning train. Quimby doubtless intended to surrender the possession and care of the trunk to the agent. Had the agent told him that he could not receive the trunk on account of the rules and regulations of the company, or for any other cause, it is not probable that he would have left it upon the platform, with no one to look after it. The agent, doubtless, regarded the trunk as a traveller's baggage to go on " No. 5," and expected that upon the arrival of the train the traveller would be on hand to go upon the same train. And from what he said to Quimby it is but a reasonable inference that he intended to receive and care for the trunk, either upon the

platform where it then was, or by subsequently putting it into the baggage-house.

We do not think that it makes any difference that Quimby did not inform the agent of the fact that the trunk belonged to appellee. Ticket agents and baggagemen know the names of but very few out of the many thousands who buy tickets and deliver baggage. Nor do we think that it makes any difference that the agent did not know to what place the baggage was to be sent. He received it to be forwarded to whatever place the owner might direct upon her arrival to take the train. It is true that the agent was called by appellee as a witness, and in his testimony in chief, and upon cross-examination, negatived the testimony of Quimby.

This evidence, although from appellee's witness, was evidence in favor of appellant. It was in conflict with the testimony of Quimby. Under the well settled rule, therefore, it was withdrawn from the consideration of the court by the filing of the demurrer to the evidence.

In passing upon a demurrer to evidence, the court is called upon to rule upon a question of law, and hence there must be no conflict as to the evidence. If a party seeks to make available a conflict in the evidence as to any fact, he must go to the jury or to the court sitting as a trier of the facts. If he resorts to a demurrer to the evidence, he thereby withdraws all evidence in conflict with the evidence which tends to establish a fact in favor of the other party. As we proceed, we shall find that the authorities support our conclusion that there was evidence tending to prove, and from which it might reasonably be inferred, that the trunk was delivered by appellee and accepted by appellant as baggage.

There is no reason why railway companies may not receive baggage in advance of the train upon which it is to be transported, and in advance of the purchase of a ticket or the payment of fare by the owner, and thus become liable for its loss. They undoubtedly have the right to make reasonable rules and regulations, and a rule that a person intending to

become a passenger shall purchase a ticket or pay fare before the company receives and becomes responsible for his baggage, is, undoubtedly, a reasonable regulation, as such a regulation secures good faith and fair dealing. But if the company adopts no such a rule, or if, having adopted, it adopts a practice and custom to the contrary, or if, notwithstanding such a rule, it receives a person's trunk as baggage, trusting to his honesty to purchase a ticket or passage upon the train upon which the trunk is to go, it will be liable for its loss, whether that loss occurs before or after the arrival and departure of the train, or before or after the purchase of a ticket or payment of fare.

In the case of *Green* v. *Milwaukee, etc., R. R. Co.*, 41 Iowa, 410, the facts were these: The plaintiff, for two and one-half years, had been teaching school in Decorah, Iowa. She spent her summers at Boscobel, Wisconsin, whither she was in the habit of going three times a year. On the afternoon of August 30th, 1870, she talked with the company's agent at Boscobel about going back to Decorah, and informed him that her trunk would be sent to the depot that afternoon to take the early morning train west. In the evening of the same day plaintiff sent her trunk to defendant's depot, labelled with her name printed on a card, and Decorah, Iowa, written below it, as she had been in the habit of doing three times a year during the previous two and one-half years. The agent was not present when the trunk was left at the depot, but the trunk was afterwards locked up in defendant's baggage-room. Passengers frequently thus sent their trunks thus marked. The agent at Boscobel had always refused to sell plaintiff a ticket, or to check her trunk to Decorah, and she had been in the habit of paying her fare and getting her check upon the train. On the night the trunk was thus put in the baggage-room the depot was burned, and plaintiff's trunk was not afterwards seen. The next morning she went to the depot for the purpose of taking passage to Decorah, but abandoned the intention because of the loss of her trunk.

The railroad company requested the trial court to instruct, that it is not enough to make the company liable, that the baggage was received by the company, but that it must be received under a contract to carry both the passenger and his baggage, and that this contract, to be binding, must be mutual and bind both parties; that if the plaintiff placed herself under no obligation to become a passenger, but only expressed an intention to become a passenger at a future time, and if, under the intention of the parties, the plaintiff could rightfully withdraw her trunk at any time without taking passage, then defendant's possession of the trunk during the night was not that of a common carrier, and the plaintiff could not recover. A further instruction was asked, that the obligation to carry the baggage can not be separated from the obligation to carry the person; that if the plaintiff left the trunk in question with the agent the night before the morning on which she intended to take the train, and paid no fare, but simply expressed an intention to take the train the next morning, she did not, by so doing, become a passenger, and was under no obligation to become a passenger at all, and the defendant's obligation to take care of a passenger's baggage did not arise unless she afterwards became a passenger. In speaking of these instructions the Supreme Court said: "These instructions, though plausible, are unsound. They both recognize the doctrine that a railroad company assumes no duties as a common carrier respecting the baggage of one, so long as he may withdraw his baggage and conclude not to take passage. A person may be entitled to be protected as a passenger without purchasing a ticket or entering a car. *Allender* v. *C., R. I. & P. R. R. Co.,* 37 Iowa, 264 (270). Yet it can not be doubted that, before doing these acts, he might abandon his intention of taking actual passage. If a person can demand protection to himself as a passenger, he may also require that his baggage be cared for as the baggage of a passenger. Suppose a party at a railway station places his baggage in possession of the bag-

gage-master and procures a check, and proceeds to purchase a ticket, but before he makes the purchase his baggage is stolen, in consequence of which he is compelled to forego the journey, and determines not to buy a ticket, may he not recover on account of the loss of his baggage ? * * * The true question is not what the party might do, without the incurring of legal liability, but what, in view of all the circumstances disclosed, did he intend to do?" It was held that there was an acceptance of the trunk as baggage, and that the railway company was liable for its loss, although the plaintiff had not purchased a ticket nor paid for her carriage. See same case, *Green* v. *Milwaukee, etc., R. R. Co.*, 38 Iowa, 100.

In the case of *Hickox* v. *Naugatuck R. R. Co.*, 31 Conn. 281, the facts were these: The plaintiff took his trunk to the station at 11 A. M., and requested that it might be checked for the next train, which started at 3 P. M. for Bridgeport. He was informed that it was not the custom to check baggage until about fifteen minutes before the time when the train should leave, whereupon he left his trunk in the care of the agent of the company in the baggage-room of the station. At the customary time it was checked for him and put on the cars for Bridgeport, and he went on the same train. When he received the trunk again it had been rifled of its contents, but whether before or after it was checked was not known. The company claimed, and asked the court to charge, that if the trunk was rifled after it was left at the station, and before it was checked, there could be no recovery. It was held that the railroad company was to be regarded as receiving the trunk for transportation when first delivered, and not for storage, and that its liability commenced as soon as it was delivered and received by the agent. The court said : "The reasonable convenience of travellers requires that they have an opportunity to deliver baggage at any reasonable time before the departure of the train, and it is therefore the duty

of a railroad company to keep an agent at all important stations to receive and take charge of baggage. * * * It (the check) is not the contract, but evidence of the ownership, delivery and identity of the baggage. It is the delivery and acceptance, the abandonment of all care of the baggage by the passenger, and the assumption of it by the agents of the carriers, expressly or impliedly for the purpose of transportation, which fix the liability of the latter as such, and that liability begins when the baggage is delivered to the agent of the company for carriage." There is no evidence that the owner of the trunk had a ticket when he left it with the agent.

In the case of *Camden, etc., R. R. Co.* v. *Belknap*, 21 Wend. 354, the facts sufficiently appear in the opinion, by BRONSON, J. He said: "The facts which remain * * are, that the defendants were common carriers between New York and Philadelphia, and that they carried passengers and their baggage, as well as merchandise. In conducting this business the defendants, either for profit or convenience, or both, kept two offices in the city of New York; in one of which (at No. 12 Washington street) they were in the habit of receiving, and, if requested, locking up the baggage of persons intending to take passage in the next boat that should depart. The plaintiff, intending to proceed on his journey by the next boat, delivered his baggage at this office, where it was received by Bliven, the defendants' servant or agent, with full knowledge of the purpose for which it was delivered. Now, I think it quite clear, upon this statement, that the plaintiff's trunks were in the possession of the defendants *as common carriers,* and that they were answerable, in that character, for the safe keeping of the property." The trunk was lost before the departure of the next boat, and the owner went by another route. He was allowed to recover the value of the trunk and contents. It is not definitely stated, but it is apparent, that he had not purchased a ticket or paid fare.

In the case of *Rogers* v. *Long Island R. R. Co.*, 1 T. & C.

(N. Y. Supreme Court R.) 396, the facts were, that the plaintiff sent his trunk to defendant's depot by an expressman. The trunk had a card fastened on it, marked with plaintiff's name and the place of his destination. The expressman placed the trunk by the side of a baggage crate, situated opposite a window in the ticket office, through which it might be seen. He informed the agent of defendant in charge of the depot where the trunk was, and such agent replied, "All right," and told two men, who were in the depot, to take care of it, whereupon the expressman left the depot. The plaintiff arrived later in the day, and purchased a ticket for Riverhead, and, upon applying for a check for his baggage, the trunk could not be found. The circuit judge charged the jury that if they credited the witness who testified to these facts, the defendant became responsible for the safe delivery of the property. The supreme court said : "We think this (charge) was correct. It is not easy to see what further act could be required of the plaintiff in order to make the delivery complete. No further act of his could put the property more fully within defendant's control." This decision was affirmed by the Court of Appeals. *Rogers* v. *Long Island R. R. Co.*, 56 N. Y. 620. Here, again, it is apparent that the owner of the trunk had not purchased a ticket or paid fare when the trunk was received by the carrier. See, also, *Bankier* v. *Wilson*, 5 Lower Canada R. 203.

It has been frequently held that under certain circumstances a person may be entitled to the rights and protection of a passenger, although he has not purchased a ticket or paid fare, and although there is no consummated contract of carriage. These cases turn upon the question as to whether or not the person in good faith *intended* to become a passenger. Thompson Carriers of Passengers, p. 42; *Allender* v. *Chicago, etc., R. R. Co.*, 37 Iowa, 264; *Cleveland* v. *New Jersey Steamboat Co.*, 68 N. Y. 306; *Gordon* v. *Grand Street, etc., R. R. Co.*, 40 Barb. 546; *Brien* v. *Bennett*, 8 Car. & P. 724. If a person thus *intending* to become a passenger, may

be entitled to the rights and protection of a passenger as to his person, there is no reason why a person thus *intending* to become a passenger may not hold the carrier for the loss of his baggage.

We can not regard the case of *Ford* v. *Mitchell*, 21 Ind. 54, cited by appellant's counsel, as controlling here, because in that case the box was not delivered to any one held out as the proper person to receive such freight.

The case of *Grosvenor* v. *New York Central R. R. Co.*, 39 N. Y. 34, also cited by appellant's counsel, turned upon the proposition, that the property for shipment was not delivered at the proper place, and that the owner carelessly left it in a dangerous position; and, further, that it was not, therefore, delivered to the carrier.

Without extending this opinion to express our approval or disapproval of the reasoning in the case upon the question of delivery, it is sufficient to say that, in the case before us, the trunk was delivered upon the platform, near the door of the baggage-room, which was certainly a proper place to deliver baggage to the baggageman. ˙ The case of *Mattison* v. *New York Central R. R. Co.*, 57 N. Y. 552, cited by appellant's counsel, was decided upon this state of facts: Upon arrival of the passenger and her baggage at the place of destination, she informed the baggage-master at the station that she desired to leave her trunk for a few ·days, perhaps for two weeks. The baggage-master replied, that he was not ·allowed to and could not keep the baggage with the check on; that if she gave up the check the baggage would be perfectly safe. This she did, and the trunk was left. About a week after it was thus left, the trunk was delivered to one falsely claiming authority to receive it. It was held (DWIGHT and EARL, C C., dissenting), that the declaration of the agent was, in substance, a notification to the plaintiff that he was without power to continue in force the obligation of the company in respect to the baggage indicated by the check, and the surrender of the check was, in effect, an admission of the performance of

that obligation, that is, of the safe arrival and the delivery of the baggage. The decision was based upon the proposition that the surrender of the check, under the circumstances, was an admission by the plaintiff not only of the safe arrival, but also of the delivery of the baggage to her, and that she was bound to know that the agent could not make storage contracts after the performance of the contract of carriage. The conclusion was combated in the opinion by the dissenting judges.

It might suffice to say of this case, that the facts are unlike the facts in the case before us. There it was a question of fact as to whether or not the owner had received her trunk from the carrier; here it is a question whether there is evidence which tends to show, or from which it may be reasonably inferred, that the carrier received the baggage from the owner. Here the agent was held out as having general authority to receive the baggage of persons intending to go upon the company's trains; there it can not be said that baggage-masters are held out as having general authority to make contracts of storage, after the completion and performance of the contract of carriage.

We are cited to the case of *Wright* v. *Caldwell*, 3 Mich. 51. In that case the owner of the trunk placed it upon a steamboat, but he did not deliver it to any one, nor call the attention of any one connected with the boat to the fact that he had placed the trunk upon the boat for carriage, or for any other purpose. That case is different in many features from the case in hearing.

Steamboats carry both freight and passengers. When a trunk, therefore, is placed upon a steamboat by the owner, it may be as freight or as baggage, according to circumstances. If not delivered and accepted as baggage, and the owner should allow the boat to depart without becoming a passenger, it is clear that he could not recover, as for lost baggage. But if a person delivers a trunk to a baggageman of a railway company, and it is received, it is difficult to see how it could rea-

sonably be said that it is received as freight. The baggage-man is held out as having authority to receive baggage, but he is not held out as having authority to receive freight. The public know that he has authority to receive baggage, and they are bound to know that he has not authority to receive freight, unless, indeed, he acts as both baggageman and freight agent. When, therefore, a trunk is delivered to an agent of a railway company who is a baggageman only, and he receives it, the presumption is that it is delivered and received as baggage.

The cases already cited by us show that a railway company may receive a trunk as baggage, and become liable for its loss as such before transit, upon the express or implied understanding that the owner is to become a passenger, although he has neither purchased a ticket nor paid fare. In such a case the express or implied agreement to become a passenger makes the owner in such sense a passenger, as to make the railway company liable for the loss of his baggage up to the time when the train leaves, and it is ascertained that the owner has not kept his agreement by becoming a passenger. If the railway company is willing to receive a trunk as baggage, and assume the responsibility of holding it as such upon the express or implied agreement of the owner to become a passenger, there is nothing to prevent it so doing.

In the case before us, the evidence tends to show that the trunk was so received; and the evidence is clear that appellee kept her agreement by purchasing a ticket for passage upon the train upon which she informed appellant the trunk was to go.

We have thus spoken of what the *company* may do. In the case before us, whatever was done in behalf of the company was by a subordinate agent, and the further contention of appellant is, that appellee's evidence shows that the agent had no authority to accept or receive baggage in advance of the train upon which it was to go, and in advance of the purchase of a ticket or the payment of fare by the

·owner. In other words, that the agent had no authority to
receive the trunk until after a consummated contract of car-
riage by the payment of fare had been entered into between
the owner of the trunk and the railway company. Appel-
lee's evidence does show that the authority of the baggage-
man was thus limited by the rules and regulations of the
·company. 'Whether or not the filing of the demurrer to the
evidence withdrew all of this evidence is a question which,
for the present, we do not decide, but treat the case as though
that evidence were to be considered.

There is no evidence at all showing, or tending to show,
that appellee had any knowledge or notice of the rules and
regulations limiting the authority of the agent, or fixing the
manner or time of receiving baggage by him. Her baggage
having been received upon a former occasion, under like cir-
·cumstances, might well have led her to believe that the com-
pany thus received baggage in advance of the train, and in
advance of the purchase of a ticket or the payment of fare.
And she might well have been confirmed in this belief by the
fact that upon this occasion the agent received the baggage
without in any way giving notice or intimating that his
authority was limited, as now contended. The course of the
agent upon this occasion, as well as upon the former, was well
calculated to prevent any inquiry by appellee as to any rules
or regulations.

Nor is there any evidence that the public generally had any
notice of the rules and regulations so limiting the authority
of the agent. Appellee, we must presume, acted in good
faith, with no notice of such rules and regulations. Having
found this, and that her trunk was delivered to, and received
by, the agent as baggage, the question is, must appellee, who
is without wrong, lose the value of her trunk and its con-
tents because the railway company had placed a limit upon
the authority of its agent? That she must thus lose, we
think, is a proposition not supported either by reason or au-
thority.

The baggageman was the agent of appellant, with general authority to receive the baggage of persons intending to go upon the company's trains. He was so held out to the public. That was the general scope of his business, authority and agency. Whatever he did within the general scope of this agency was binding upon the company, unless the owner of the baggage, in some way, had notice of a limitation imposed upon his general authority.

Mr. Wood, in his work on Railway Law, vol. 1, p. 447, citing authorities in support of this text, says: "Strangers dealing with the agent of a corporation are not bound to inquire what the corporation has in fact authorized him to do, but may deal with him in reference to those powers which it has held him out to the world as being possessed of,—in other words, in reference to his apparent authority. * * * The maxim *qui facit per alium, facit per se* applies with full force to corporations; and the rule is not a doubtful one, either in policy or principle, that in transactions where one of two persons must sustain a loss, the loss must fall upon him who has made it possible for the other, innocently, to be placed in a position where loss might result to him except for the application of this rule. It would be disastrous to commercial, as well as other interests, if a person, by acting through the agency of another, could shield himself from liability for such person's acts *ad libitum*. Fortunately, no such rule exists, and he who intrusts authority to another, in whatever department of business, is bound by all that is done by his agent *within the scope of his apparent power*, and can not screen himself from the consequences thereof upon the ground that no authority in fact was given him to do the particular act, unless the act was clearly in excess of his apparent authority, or was done under such circumstances as to put the person dealing with him upon inquiry as to his real authority. * * The rule may be said to be, that restrictions upon an agent's apparent authority are not binding upon third persons, where there is nothing to put them upon inquiry as to the extent of

his actual authority. The question is not what the powers of the agent in fact were, but what power did the company hold him out as possessing? From the business with which the agent was intrusted, had the person dealing with him a right to understand that he had authority to do the particular act, in reference to which the principal denies his authority?" And again, at page 425, of the same volume, the author says: "So station agents are presumed to have power to make contracts for their railroads for the transportation of freight. The limitations on their powers the public can not take notice of, unless they are conveyed to the public in such a manner as to authorize the inference that shippers are apprised of them."

These are familiar principles, and supported by authority everywhere. *Evansville, etc., R. R. Co.* v. *McKee,* 99 Ind. 519 (50 Am. R. 102); *Louisville, etc., R. W. Co.* v. *Mc Vay,* 98 Ind. 391 (49 Am. R. 770); *Pennsylvania Co.* v. *Weddle,* 100 Ind. 138; *Pruitt* v. *Hannibal, etc., R. R. Co.,* 62 Mo. 527; *Bodine* v. *Exchange Fire Ins. Co.,* 51 N. Y. 117 (10 Am. R. 566); *Insurance Co.* v. *Wilkinson,* 13 Wall. 222; *Eclectic Life Ins. Co.* v. *Fahrenkrug,* 68 Ill. 463; *Farmers, etc., Ins. Co.* v. *Chestnut,* 50 Ill. 111; Hutchinson Carriers, sections 267-8-9; *Heenrich* v. *Pullman, etc., Co.,* 18 C. L. J. 293.

The facts in the case of *Armour* v. *Michigan Central R. R. Co.,* 65 N. Y. 111 (22 Am. R. 603), are these: M. got from the company's agent two bills of lading for a quantity of lard, consigned to the plaintiffs at New York. These bills recited the receipt of the lard by the company. M. made drafts upon the plaintiffs for $7,200, and attached thereto the bills of lading. Upon the faith of these bills, plaintiffs paid the drafts. The fact was that the railway company's agent issued these bills before the receipt of the lard, and it never was received by the company. The company defended on the ground that the authority of Street, its agent, was confined to bills of goods actually within its control, and that as the lard had not been delivered when the bills of lading were issued by

him, he exceeded his authority and the company was not liable to the plaintiffs who had paid the drafts upon the faith of the bills.

In answer to this argument the court, amongst other things, said : " Street; having power to issue bills direct to consignees for goods actually in the possession of the defendant, and the present bills being in no ways distinguishable in form from those which were usually employed, he must be considered as having the necessary authority as to the plaintiffs acting in good faith."

A case, involving a state of facts almost identically the same as involved in the case last above, has recently been decided by the Supreme Court of Pennsylvania. *Brooke,* v. *New York, etc., R. R. Co.,* 1 Cent. Rep. 123, citing and approving *Armour* v. *Michigan Central R. R. Co., supra.* The court said : " It is contended that, inasmuch as no authority, real or apparent, to issue bills of lading without receiving the goods mentioned therein, has actually been given by the railroad company to Weiss (agent), it was not in any manner responsible for his unauthorized act, even as to innocent third parties who were misled and injured thereby. We can not assent to this proposition. As between principal and third parties, the true limit of the agent's authority to bind the former is the apparent authority with which the agent is invested, but, as between the principal and the agent, the true limit is the express authority or instruction given to the agent. Evans Agency, 594, 606 ; *Adams Ex. Co.* v. *Schlessinger,* 75 Pa. St. 246. The principal is bound by all the acts of his agent within the scope of the authority which he held him out to the world to possess, notwithstanding the agent acted contrary to instructions, and this is especially the case with officers and agents of corporations. Since a corporation acts only through agents it is bound by its agents' contracts when made ostensibly within the range of their office."

The decisions in the two cases last above were made to turn to some extent upon the doctrine of estoppel ; that where one

of two persons must suffer by the wrong of a third, he shall lose who puts the third person in a position to commit the wrong. That doctrine may well be applied to the case before us. Appellant's agent had general authority to receive the baggage of persons intending to go upon its trains. It is claimed that the company had put a limit upon his authority, as to the time and manner of receiving such baggage. This limitation was not known to appellee, nor was there anything to put her upon inquiry; on the contrary, the course of the agent was such as to prevent inquiry.

Acting within the general scope of his employment, the agent received the trunk as baggage, and then abandoned all care of it, and left it upon the platform. If he had declined to receive the trunk, it would not have been lost. By his wrong it was lost. Appellant placed him in a position, and clothed with apparent authority, to receive the trunk as he did. Appellee having relied upon his apparent authority, and having upon this reliance placed her trunk in his possession, the railway company can not now, to escape liability, be heard to say that in receiving the trunk the agent exceeded his real authority.

Of course, railroad companies do not give out that their baggage-rooms are store-houses, and hence the public have no right to assume that they are such. Persons would have no right to send their baggage to such baggage-rooms to be kept in store, or to be kept for an unreasonable time as baggage awaiting trains. The time prior to a train, therefore, must be a reasonable time. If the time should be unreasonable, that of itself might be sufficient to put persons upon inquiry even though the baggage should be received by the agent. The time in this case, from 9:30 at night until the 4:25 morning train, was not unreasonable, nor of itself sufficient to put appellee upon inquiry as to the authority of the agent to receive the baggage.

In support of the contention that appellee was bound to know of the rules and regulations limiting the manner and

time of the receipt of baggage by the agent, appellant's counsel cite the cases of *Eaton* v. *Delaware, etc., R. R. Co.*, 57 N. Y. 382 (15 Am. R. 513), *Cleveland, etc., R. W. Co.* v. *Bartram*, 11 Ohio St. 457, and *Elkins* v. *Boston, etc., R. R. Co.*, 23 N. H. 275. These cases assert the familiar doctrine that all persons are bound to know that freight trains are for the carrying of freight, and passenger trains for the carrying of passengers, and hence must also take notice of the rules and regulations of railway companies, by and under which freight may be sent upon passenger trains, or passengers may go upon freight trains. The fact that there are freight and passenger trains is notice to the public that the carrier has made a division of its business. Persons are, therefore, bound to know that they can not, as a matter of right, travel upon freight trains; that if allowed upon them at all, it must be by special leave and as a special favor, or under such rules and regulations as the railway companies may have adopted. They are bound to know these things, because the division of the carrier's business puts them upon inquiry.

In the case of *Ohio, etc., R. W. Co.* v. *Hatton*, 60 Ind. 12, cited by appellant's counsel, it was held that it is the duty of persons, before taking passage upon trains, to ascertain whether or not, under the running regulations of the company, they will stop at the stations to which such persons may wish to go.

It is notorious, that in the rapid transportation of through passengers, all trains do not stop at every station. They are not held out as so stopping. And hence it is, that persons are put upon inquiry, and must ascertain whether or not any particular train stops at their particular station. This is a different case from that of clothing an agent with apparent general authority, and imposing secret limitations with nothing to put persons upon inquiry.

We have extended this opinion somewhat, on account of the importance of the questions involved, and the earnestness and ability with which those questions have been dis-

cussed by counsel. After this extended and careful examination, we are clear in our opinion that the judgment should be affirmed. It is, therefore, affirmed with costs.

MITCHELL, J., did not participate in the decision of this case.

Filed Dec. 29, 1885.